OPINION OF THE COURT
S. Barrett Hickman, J.
Motion by plaintiffs for summary judgment, including awarding attorneys’ fees.
Cross motion by nonparty the Association of Graduates of the United States Military Academy (AOG) for summary judgment in favor of plaintiffs other than an award of attorneys’ fees.
On or about November 18, 1997, one Lee B. Ledford (Ledford or Colonel Ledford), as part of a complex estate plan, established several independent entities into which he was to place his considerable assets so that they would be available to him during his lifetime and thereafter be distributed to various persons or entities after his death. Ledford established several limited partnerships, the Lee B. Ledford Living Trust dated November 18, 1997 (Living Trust) and Dring, a New York corporation. Dring was to own the controlling interest of each limited partnership by becoming the one percent General Partner while each of the 99% limited partnership interests would first be held by Ledford and would then ultimately be transferred to the Living Trust or to others. Ledford also executed a last will and testament by which all of his assets not previously transferred to the Living Trust would be “poured-over” into the Living Trust.
The architect of the entire estate plan was one Stevens Kas-selman, Esq. (Kasselman). The estate plan is apparently based upon what is known as the Fortress Plan, a copyrighted product, which has as its principal purpose, when combined with a “charitable alliance,” of allowing an estate to obtain a large estate tax deduction with the possibility of subsequently reclaiming most of the estate assets for the intended heirs at a fraction of their value.
Ledford, the grantor, and defendant Frank Bolden (Bolden) were originally the two trustees of the Living Trust. It is undisputed that Bolden was Ledford’s caretaker and companion for many years. Bolden is also a beneficiary of the Living Trust and its sole income beneficiary. On August 10, 1999, upon Led-ford’s death and pursuant to the provisions of the Living Trust, the postdeath trustees of the Living Trust were Bolden, Claude S. Hill (Hill), a longtime friend of Ledford, Michael R. Quis *356 (Quis), Ledford’s accountant, and one Brian O’Connor, who, according to his affidavit dated February 27, 2002 in opposition to the instant motions, was a close friend of Ledford for the last 19 years of his life during which he advised Ledford on financial matters.[1] By order of this court dated June 4, 2000 in a related proceeding (Index No. 411/2000), Mr. O’Connor was removed as a trustee upon his conviction of a federal crime for which he was imprisoned. Hill and Quis, as trustees, are the plaintiffs in this action.
Dring’s corporate books reflect that when it was organized on November 18, 1997, 67 shares of its common stock were issued to Ledford as evidenced by share certificate No. 1 and 33 shares of its common stock were issued to Bolden as evidenced by share certificate No. 2. Ledford and Bolden were initially elected as Dring’s sole directors and officers. Ledford and Bolden also executed a shareholder’s agreement which, inter alia, placed certain restrictions on the transfer of the shares of common stock of Dring owned by Ledford during his lifetime and upon his death.
Ledford thereafter transferred approximately $3 million of his assets consisting of stocks and bonds to a limited partnership organized by him and known as Dring Management, LP (LP). The General Partner of LP was Dring, which owned one percent of LP’s partnership interests, while the sole Limited Partner was Ledford who held the remaining 99% of LP’s interests. On October 2, 1998, Ledford assigned this limited partnership interest in LP to a not-for-profit corporate charitable foundation established by him and known as the Lee B. Ledford Charitable Foundation (the Charitable Foundation).
In addition, Ledford organized two other limited partnerships into which he separately transferred designated parcels of improved, income producing real property that he owned in the states of Florida and Kentucky, and as he had done with LP, the one percent General Partner for each of these real estate holding limited partnerships was Dring, while the 99% Limited Partner of each was Ledford. Each limited partnership agreement provided that in consideration for Dring managing the assets of LP and the other two limited partnerships, Dring was to receive certain substantial management and other fees from the partnerships. After all the fees and other charges *357 were paid to Dring, the profits generated from these limited partnerships could then be determined and the partners paid their distributions, to wit: one percent to the General Partner, Dring, and 99% to the Limited Partner, i.e., Ledford and the Charitable Foundation. Ledford never transferred the limited partnership interest of the two real estate partnerships to the Living Trust, such that these interests form a part of Ledford’s probate estate.
Quis cogently asserts in his affidavit dated February 13, 2002 that with Dring being the General Partner for each of the limited partnerships, Dring has the power and authority to effectively control the bulk of the assets that Ledford owned as well as the “sole and exclusive right to determine the amount of the ‘profits’ derived from those assets through its power to manipulate and allocate costs and fix fees chargeable to each limited partnership. Also, Dring alone has the exclusive power and authority to direct when and where those profits, if any, would be paid, as each limited partnership agreement specifically permits the General Partner to withhold the distribution and payment of profits to the Limited Partners.”
On May 26, 1999, at Dring’s annual meeting, Quis, Ledford, Bolden and one F. Xavier Saavedra, a financial advisor for both Ledford and Bolden, were elected as Dring’s directors. Quis was also elected treasurer of Dring. According to Quis, in November or December 1999, he came into possession of the Dring stock and minute books, which he then reviewed for the first time. These documents had until then been maintained by Kasselman, who had acted as custodian for the books and as stock transfer agent for Dring.
In 2000, Quis and Hill commenced a proceeding in this court (Index No. 1235/00) for an order directing that Bolden be discharged as a cotrustee of the Living Trust as being unsuitable to act as a fiduciary, prohibiting him from appointing a successor trustee and for a judgment declaring who were the actual and proper trustees of the Living Trust. Bolden cross-petitioned for an order, inter alia, declaring that Quis was no longer a trustee, having been properly discharged by notice. By order dated March 28, 2001, the court held that the attempted removal by Bolden was premature and should not be addressed until the Living Trust was terminated, the estate administered and a proper accounting issued directing final pay over to the trust. The decision stated that “[a]t that time Bolden will then be the sole beneficiary of the income from his fully funded trust and at that point he may attempt to exercise the claimed power of removal.”
*358 While the matter concerning the trustees of the Living Trust was sub judice, Quis and Hill commenced the instant action against Bolden. According to the complaint’s first cause of action, on December 19, 1997, Ledford, with the knowledge and consent of Bolden and Dring, transferred and assigned his 67 shares of Dring stock to Ledford and Bolden as trustees of the Living Trust then in office at the time, which transfer and assignment was registered on Dring’s books and records. As a result, Dring allegedly caused to be issued to those trustees its certificate No. 3 representing evidence of the trust’s ownership of 67 shares.
The cause of action further alleges that on or about June 29, 1999, in purported compliance with Dring’s bylaws, Bolden “supposedly” caused a special meeting of Dring’s board of directors to be held for the alleged purpose of approving the tender of Ledford’s 67 shares of stock in Dring to Bolden. Ledford is alleged to have owned no shares of Dring at that time which he could tender to Bolden or to anyone else. Bolden was allegedly the only Dring director present at the special meeting at which the Dring directors allegedly consented to the transfer of Ledford’s shares in Dring to Bolden. The complaint additionally alleges that on June 30, 1999, Bolden purportedly caused to be issued to himself 67 shares of Dring’s common stock as evidenced by Dring certificate No. 4. Bolden thereafter allegedly unjustly claimed to be the sole owner of all the shares in Dring, refusing to acknowledge the ownership of the trustees of the trust to any of the shares in Dring even though he is one such trustee, taking over the complete control of Dring and refusing to permit plaintiffs any right to vote the shares of Dring allegedly owned by the Living Trust.
The complaint’s second cause of action alleges that Bolden, on or about August 24, 2000, without the knowledge, permission or consent of plaintiffs, authorized and accepted a payment of $200,000 from the assets of the Living Trust to himself. That authorization and payment is alleged to have been without consideration, wrongful, and amounting to an act of personal self-dealing by a trustee.
In its wherefore clause with respect to the first cause of action, the complaint seeks (1) to enjoin Bolden from voting, selling, assigning and/or transferring any of the 67 shares of Dring stock that he allegedly received from Ledford or anyone else, as well as (2) a declaration that the trustees of the Living Trust are the owners and holders of those shares as evidenced by Dring certificate No. 3, free and clear of any of the restric *359 tions endorsed thereon, and (3) an order canceling certificate No. 4 on Dring’s books and records.
The wherefore clause with respect to the second cause of action seeks to surcharge Bolden in the amount of $200,000 for the allegedly unauthorized payment to him with a direction that he repay the same to the Living Trust, together with interest, costs and disbursements and reasonable attorneys’ fees for recovering the same or, in the alternative, granting plaintiffs, as trustees of the Living Trust, a judgment against Bolden in the sum of $200,000 together with interest, costs and disbursements and attorneys’ fees.
Following joinder of issue and upon motion of plaintiffs, by decision and order dated June 14, 2001, Bolden was restrained, during the pendency of this action, from voting the 67 shares of Bring common stock as evidenced by certificate No. 3 and from selling, assigning or otherwise transferring those shares to any third person, firm or entity.
With all discovery having been completed and a trial date scheduled, plaintiffs have now moved for summary judgment. That motion is supported by Dr. Alice W. Brown, as a director of, and on behalf of, the Lee B. Ledford Foundation (the Foundation) and the Appalachian College Association, Inc. (ACA), the Foundation’s primary charitable beneficiary. The Foundation is the ultimate charitable beneficiary of the Living Trust. The New York State Attorney General’s Charities Bureau, which appears as the statutory representative of ultimate charitable beneficiaries pursuant to article 8 of the Estates, Powers and Trusts Law, also supports the motion in all respects. The AOG, the secondary charitable beneficiary, cross-moves seeking summary judgment in favor of the plaintiffs on each cause of action contained in the complaint but affirmatively opposes any attorneys’ fee award to plaintiffs as trustees.
Among the arguments raised by plaintiffs are that Ledford’s 67 shares could not have been sold to Bolden in June 1999 because Dring’s books and records unequivocally show that in December 1997, Ledford transferred all of his 67 shares in Bring to himself and to Bolden “as Trustees of the Lee B. Led-ford Living Trust dated November 18, 1997” and the certificate registry for those shares as well as the Bring stock transfer ledger acknowledged and memorialized such transfer. Plaintiffs alternatively contend that even if it is held that Ledford owned these shares in June 1999, should the court determine that Ms prior transfer of shares to the Living Trust was somehow defec *360 tive, a fact not conceded, there would still be a requirement that before Ledford could validly transfer such shares to Bolden or to anyone else, Dring must approve the transfer. Plaintiffs go on to argue, factually, how, in their opinion, such approval was never lawfully obtained. In particular, they question whether the special meeting referred to in the complaint was ever held or, if it is determined that such meeting did occur with approval of the sale supposedly obtained, whether the meeting was properly noticed.
In his affidavit, Bolden states that he never saw or prepared the alleged minutes of a Dring board of directors meeting held on June 29, 1999 and that he never signed them, notwithstanding what he concedes appears to be his signature. He avers that there was no such meeting held on June 29, 1999 and that he was not Dring’s secretary at that time. Bolden claims that there was in fact a meeting held on July 21, 1999, when Colonel Ledford was hospitalized for his last illness (prior to his death on August 10, 1999). According to Bolden, that meeting was attended by Quis and a quorum of Dring’s directors; Kasselman was also allegedly in attendance.
Pursuant to Bolden’s account, Kasselman’s diary confirmed the sale of corporate shares to Bolden on June 30, 1999. Quis allegedly knew that Bolden had purchased the stock, was present at the July 21, 1999 meeting and ratified all that occurred at the meeting including a discussion about the stock purchase, by accepting a director’s fee for his attendance.
Bolden points to certain evidence, including the 1999 K-l for Dring, prepared by Quis, its accountant, to show that Ledford actually owned the 67 shares of Dring stock in 1999, plaintiffs’ claims to the contrary notwithstanding.
The court is unable to determine the veracity of Quis and Bolden on the papers submitted with respect to the first cause of action. That being said, not only is the credibility of these parties not dispositive but it is in fact irrelevant for reasons advanced by counsel for Dr. Brown and the ACA. In their memorandum of law, these parties persuasively assert that the confidential, fiduciary relationship that Bolden held with respect to Colonel Ledford renders the sale of Dring stock to Bolden void unless he can affirmatively prove that it was valid.
In Matter of Gordon v Bialystoker Ctr. (45 NY2d 692 [1978]), the Court of Appeals addressed the validity of a gift made by an elderly, infirm woman, shortly before her death, to the nursing home which she entered for the last 22 days of her life. In discussing the applicability of the law of constructive fraud, the Court (45 NY2d 692, 698-699, supra) stated as follows:
*361 “Under that doctrine, where a fiduciary relationship exists between parties, ‘transactions between them are scrutinized with extreme vigilance, and clear evidence is required that the transaction was understood, and that there was no fraud, mistake or undue influence. Where those relations exist there must be clear proof of the integrity and fairness of the transaction, or any instrument thus obtained will be set aside or held as invalid between the parties’ (Ten Eyck v Whitbeck, 156 NY 341, 353). As was said long ago, in articulating the concept of constructive fraud: ‘It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from an overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled’ (Cowee v Cornell, 75 NY 91, 99-100). So here, the Appellate Division properly concluded that defendant, rather than plaintiff (as the Justice at Trial Term had held), bore the burden of proof on the issue whether Ida’s gift of funds was freely, voluntarily and understandingly made.”
There can be no question that a confidential relationship existed between Bolden and Colonel Ledford. It is evident from the record that Bolden assumed complete responsibility for the care of Ledford as of 1997, when Ledford gave him a power of attorney. Ledford was at that time an elderly person, in declining health. Thus, even if his version of events concerning his purchase of the 67 shares of Dring stock is deemed to be true, the burden of proof shifts to Bolden to demonstrate, by clear and convincing evidence (see, JML Invs. Corp. v Hilton, 231 *362 AD2d 493 [2d Dept 1996]), that this sale to him of the subject shares of stock was fair, open, voluntary and well understood.
Dr. Brown and the ACA establish that Bolden has failed as a matter of law to meet his burden of proving the validity of the sale of stock to him, such that it must be declared void and set aside. As they assert, even under Bolden’s version of the events, Bolden, as well as Kasselman, acted on both sides of a transaction in which Bolden purportedly purchased the stock in question at an amount well below its actual value and by using Colonel Ledford’s own funds, in whole or in part, to pay the consideration without ever determining whether Colonel Led-ford approved or was even aware of the transaction.
Under Bolden’s version of the events, he was advised by Kasselman both to purchase the 67 shares and also that he could act under the power of attorney he had from Colonel Ledford to transfer the shares from Colonel Ledford to himself in his individual capacity. The purchase price of $18,000 was allegedly agreed upon by Kasselman and Quis, having been reduced from a price of $25,000 proposed by Mr. O’Connor, another participant in the meeting. Bolden then acted under his power of attorney to sell himself the 67 shares, paying for them by drawing a check on a joint account in his own name and that of Colonel Ledford, who had contributed part of the account balance. Colonel Ledford was on his deathbed at the time and Bolden never discussed this transaction with him or sought his approval. Kasselman was at the time not solely representing Colonel Ledford, who therefore had no independent legal representation in connection with this matter (cf., Peters v Nicotera, 248 AD2d 969 [4th Dept 1998]).
Moreover, the $18,000 paid is inadequate on its face as a purchase price for a controlling interest in a corporation that had both almost complete control of assets worth in excess of $3 million as well as $137,000 in its own name. At his deposition, Kasselman denied that he had a role in fixing the purchase price but confirmed that an appraiser would have been required to do so.
Accordingly, the presumption of invalidity required for transactions between persons in a confidential relationship is applied to the purported sale and that transaction is declared void.
In his memorandum of law, at Point I, Bolden had raised a substantive claim that Ledford had not complied with Dring’s shareholder’s agreement with respect to Dring’s and then Bold-en’s option to purchase shares such that the shares could not *363 have been validly transferred from Ledford to the Living Trust. Thus, it is argued that any purported transfer to the trust was void, such that the 67 shares remained owned by Ledford (and presumably available to be sold by him to Bolden using the power of attorney).
As Quis and Hill point out in their reply memorandum, Point I of Bolden’s memorandum essentially refers to an unpleaded defense or claim which is also neither mentioned nor alluded to within any of the affidavits submitted by Bolden in opposition to the motion. This claim or defense, raised at this stage and in this manner, is impermissible (CPLR 3018) and is not considered by the court.
Thus, the court shall not declare that Colonel Ledford’s transfer of his 67 shares of Dring stock to the Living Trust was void and further declares that on his date of death, he still retained ownership of those shares. This is alternative relief suggested in plaintiffs’ reply memorandum at the unnumbered fourth page. Such relief could only be granted were the court to have considered Point I in Bolden’s memorandum. Rather, summary judgment is granted and the court declares, as sought in the complaint, that the trustees of the Living Trust are the owners and holders of the 67 shares of Dring common stock as evidenced by Dring certificate No. 3, free and clear of any of the restrictions endorsed thereon. In addition Dring’s stock transfer agent is directed to cancel Dring certificate No. 4 on Dring’s books and records.
Insofar as the complaint’s second cause of action is concerned, plaintiffs allege that on April 24, 2000,[2] Bolden, while a post-death trustee of the Living Trust, wrongfully took $200,000 from the assets of the Living Trust without the knowledge, permission or consent of his copostdeath trustees, and he has refused to return the monies. Bolden concedes that the monies were paid to him but alleges that it was not at his request but rather at Quis’ suggestion/direction and over his (Bolden’s) objection that he did not need the money and did not know why the distribution was to be made at the time.
Quis denies that he either approved or authorized the $200,000 payment. According to Quis, the payment was completed before he even knew about it or whether such payment could be legally accomplished. Moreover, he denies that he had written authorization filed with Wall Street Access, the *364 custodian of the financial assets of the Living Trust at the time, to deal with any of the trust assets then under its control.
Finally, Quis maintains that even if, arguendo, he approved such payment, his approval, by itself, would not validate payment as Bolden needed the further approval for such payment from at least one other postdeath Living Trust trustee then in office. As he notes, the trustees of the Living Trust on April 24, 2000 were himself, Hill, O’Connor and Bolden. In view of Bold-en’s status as an “Interested Trustee” in the transaction, pursuant to article 14, section 3r of the Living Trust Indenture, Bolden was barred from acting in any respect concerning that payment. Also, article 13, section 8 of that same Indenture requires that the majority of the trustees concur in decisions affecting the Living Trust. Thus, in order to be valid, at least two of the remaining trustees had to concur in the payment. Hill has submitted an affidavit in which he affirmatively denies ever authorizing or approving the payment. Quis asserts that it is unlikely that O’Connor approved the payment since the latter was a resident of the Allenwood Federal Penitentiary at the time. With respect to O’Connor, it is noted that although Bolden submitted O’Connor’s affidavit in opposition to plaintiffs’ motion, that affidavit is devoted solely to his recollection of the disputed Dring board of directors meeting and Bolden’s purchase of the 67 shares of Dring stock. O’Connor’s affidavit is absolutely silent with respect to the issue of whether he authorized and/or approved the $200,000 payment to Bolden.
Thus, plaintiffs establish that the transfer of $200,000 from the Living Trust to Bolden was not approved by the required number of trustees and payment must be returned to the Living Trust. Plaintiffs are therefore awarded summary judgment on their second cause of action and Bolden is surcharged in the amount of $200,000 and is directed, within 30 days after service of a copy of this order with notice of entry, to repay that amount to the Living Trust together with interest at the rate of nine percent per annum from April 24, 2000 and the costs and disbursements of the action.
In their motion, plaintiffs seek a direction that their attorneys’ fees be assessed against Bolden and made a part of the judgment. Martin J. King, Esq., plaintiffs’ attorney, has submitted affirmations of services in which he seeks an award to plaintiffs in the amount of $25,657.50. For the reasons that follow, the court declines to summarily either award attorneys’ fees or to determine the amount of such fees.
First, it is noted that plaintiffs’ complaint expressly seeks attorneys’ fees solely with respect to the second cause of action; *365 no such award is sought with respect to the first cause of action. Notwithstanding this, Mr. King’s itemized schedules of legal services rendered do not at all distinguish his time expenditures with respect to the separate causes of action.
Second, any fee award is implicitly opposed by Bolden and explicitly opposed by the AOG, which otherwise supports plaintiffs’ motion.
Third, plaintiffs are themselves the subject of a pending proceeding in this court (Index No. 625/01) in which Dr. Brown and the ACA seek their removal as directors of the Lee B. Led-ford Foundation for, inter alia, the alleged: (1) impermissible appointments of their own family members as additional directors of that Foundation; (2) improper attempts by them to eliminate the interest of Dr. Brown and the ACA in the Foundation; (3) failure of Quis to properly file tax returns; and (4) failure to properly distribute investment income. Curiously, despite the foregoing, the supporting submissions of Dr. Brown and the ACA appear to seek the grant of plaintiffs’ motion in its entirety, including an award of attorneys’ fees.
Finally, if plaintiffs were seeking attorneys’ fees with respect to the first cause of action (as well as for the second for which fees were clearly sought), it is noted that the source of the prevailing argument with respect to the first cause of action was counsel for Dr. Brown and the ACA.

. According to Quis, neither he nor Hill entered upon their postdeath trusteeships until about November 1999, after they had physically seen and read the Living Trust Indenture delivered to them by Bolden.

. The complaint erroneously refers to the date as August 24, 2000, according to Hill’s affidavit dated February 13, 2002 (at 11).